UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,      CASE NO. 08-20669-08

  v.          HON. ROBERT H. CLELAND

REGINALD STATOM,

    Defendant.

_____/

### United States' Response Opposing
### the Defendant's Motion for Compassionate Release

Defendant Reginald Statom is currently serving a sentence of 205 months in prison after he pleaded guilty to one count of conspiracy to distribute more than 5 kilograms of cocaine, in violation of 21 U.SC. §§ 841(a)(1) and 846. (R. 142: Judgment, 426). Statom began serving this sentence on February 23, 2010. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau

1

of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 17, 2020, these directives have already resulted in at least 2,783 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Statom does not qualify for compassionate release. Because Statom has not sought compassionate release from the Bureau of Prisons based on Covid-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his Covid-19-based argument until he exhausts his administrative remedies. Nor, in any event, does Statom satisfy the statutorily mandated criteria for compassionate release. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Statom's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Statom's age and medical conditions— asthma and an enlarged prostate--do not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Statom has an inhaler to control his asthma and takes medication for an enlarged prostate. His offense and criminal history also make him a danger to the

2

community, *see* USSG § 1B1.13(2), because of his recidivism and failure while under supervision. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because of the seriousness of his offenses and the need to protect the public from further crimes.

## Background

Statom is now serving his second federal prison sentence for drug distribution. Statom previously pleaded guilty to conspiracy to distribute a controlled substance and was sentenced to 84 months in prison, followed by 48 months of supervised release. *United States v. Peterson et al*, No. 1:99-CR-20018-16 (E.D. Mich.) (R. 659: Judgment). Statom was still on supervised release when he was again involved in a drug conspiracy to distribute at least 5 kilograms of cocaine, 50 grams of cocaine base, 50 grams of heroin, and marijuana. (R. 89: Superseding Indictment). He pleaded guilty pursuant to a plea agreement to a single count of possessing with the intent to distribute more than 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 841 and 846. (R. 142: Judgment, 426; R. 112: Plea Agreement). Statom faced mandatory life imprisonment because of two prior controlled substance offense convictions, but received a reduced sentence on the government's motion for his cooperation against a co-defendant. (R. 92: Information, 176; R. 118, Transcript, 311-312). Statom's sentence was within the

guideline range recommended by the government in exchange for his cooperation. (R. 112: Plea Agreement).

Statom began serving his prison sentence on February 23, 2010, and is currently incarcerated at FCI Terre Haute. He is 51 years old, and his projected release date is May 17, 2024. His only underlying medical conditions are asthma of an unspecified severity, which is treated with an inhaler as needed, and an enlarged prostate. Nevertheless, Statom has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Statom has not requested compassionate release from the Bureau of Prisons so he has not fully exhausted his administrative rights.

## Argument

### I.  The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A.  The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until May 18, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. And the movement of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit

or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.      The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of

6

time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2,783 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release

8

conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting

9

Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.     The Court should deny Statom's motion for compassionate release.

Statom's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United*

*States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, as this Court has previously recognized, compassionate release requires exhaustion. *United States v. Walls*, No. 92-80236, 2020 WL 1934963 at *2 (E.D. Mich. April 22, 2020); *United States v. Austin*, No. 15-CR-20609, R. 657 at 5687 (finding that a failure to exhaust administrative appeals "forecloses Defendant's ability to bring his own motion for compassionate release."). If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

11

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

**A.     The Court is barred from granting release because Statom has not exhausted his administrative remedies.**

The Court must dismiss Statom's motion because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018). But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

13

Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*, 607 F.3d at 1125. The statute "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c)'s requirements were not considered truly jurisdictional, they would still be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. Rather, "[g]iven BOP's shared desire

14

for a safe and healthy prison environment, . . . strict compliance with

§ 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—

importance." *Id.* at 597.

The majority of district courts to decide this question nationwide, including

many in our district, have similarly held that a "failure to exhaust" under

§ 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic."

*United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich.

Apr. 8, 2020); *accord United States v. Shah*, No. 16-20457, 2020 WL 1934930, at

*2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02,

2020 WL 1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020). As one of the those

decisions has explained, the few courts that have excused exhaustion under

§ 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-made* exhaustion

requirements, not *statutory* exhaustion requirements. *Mathews*, 2020 WL 1873360,

at *2–*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement apply with

even greater force during the COVID-19 pandemic. The Bureau of Prisons is

already responding to the pandemic—not just through heightened safety measures,

but by evaluating its entire prison population for home confinement. By requiring a

defendant to exhaust, § 3582(c)(1)(A) gives the Bureau of Prisons the opportunity

to gather his medical documentation and other records, evaluate his request, and

decide in the first instance whether it justifies either compassionate release or some

other form of relief.

Statom did not pursue any administrative remedies, much less exhaust them.

BOP has no record of any request by Statom for compassionate release. Statom has

therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

## B.   There are no extraordinary and compelling reasons to grant Statom's compassionate release.

Even if Statom had exhausted his administrative remedies, compassionate

release would be improper. Compassionate release must be "consistent with

applicable policy statements issued by the Sentencing Commission." 18 U.S.C.

§ 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing]

what should be considered extraordinary and compelling reasons for [a] sentence

reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied

and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in

USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s

reliance on the Sentencing Commission's policy statements mirrors the language

governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive

guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When

16

Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant

17

compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Statom relies on his medical condition, but he is not eligible for compassionate release on that basis. He is not suffering from any terminal illness, serious impairment, or deteriorating health from the aging process. Statom has been prescribed an inhaler for his asthma and his enlarged prostate has been monitored and treated with medication for years without incident. Neither of these conditions "substantially diminish[]" his ability to provide self-care while in prison USSG § 1B1.13 cmt. n.1.

Nor is Statom's correct in suggesting that the Covid-19 pandemic should alter this analysis here. Even assuming, in other cases, that a defendant's risk from Covid-19 might make the difference in his eligibility for release under § 1B1.13, Statom's circumstances do not satisfy that standard. There is no record that he suffers from moderate to severe asthma and has only an inhaler for use as needed. His medical conditions do not place him at greater risk for contracting Covid-19 or for complications if he did, nor does his age. As Statom's prior conduct shows, he would also be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order. So it is hardly clear that Statom faces a greater risk now than he would if released.

Nor does the Covid-19 pandemic by itself qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Statom and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

Statom is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." Statom is serving his second federal sentence for drug distribution. He first served 84 months in prison and then conspired to distribute at least 5 kilograms of cocaine while on supervised release. He avoided a mandatory life sentence only by cooperating against a co-defendant. He is still relatively young, healthy, and physically capable of returning to drug dealing, just as he did before. His sentence to 205 months in prison reflected his recidivism and the need for a lengthy term of

incarceration to protect the community from future crimes. This factor, too, forecloses relief here.

Statom is not eligible for compassionate release.

### C.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. So even if the Court were to find Statom eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Statom's sentence reflected the seriousness of his offense, the need for just punishment, and his history and characteristics. Statom was not deterred by his prior 84-month federal prison sentence or being on supervised release at the time he joined the conspiracy. The conspirators moved large quantities of cocaine, crack, and heroin from Mexico to Detroit for distribution through a hair salon and other places. (PSR, ¶10--24). They maintained at least two stash houses and defended them with firearms. (*Id.*). Statom was a distributor of multi-kilogram quantities of cocaine. (PSR, ¶ 16). When stopped with 5 kilograms of cocaine in

his car, Statom rammed the agent's vehicle, hit a bystander's car, and escaped by driving across the median of I-94. (*Id.*).

Statom faced a mandatory life sentence which he avoided by cooperating against his co-defendants. In addition, Statom was categorized as a career offender because of his repeated drug offenses. (PSR, ¶36). His sentence was the midpoint of the recommended guidelines range under the plea agreement. (PSR, ¶ 91). His term of imprisonment was necessary to protect the public against future crimes and his motion raises nothing to diminish that. Statom's sentence was sufficient and reasonable under these circumstances.

## III.   If the Court were to grant Statom's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Statom's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Statom's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

21

*s/Thomas Franzinger*
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9774
E-Mail: thomas.franzinger2@usdoj.gov

Dated:  May 18, 2020

## Certificate of Service

I hereby certify that on May 18, 2020, I electronically filed the foregoing document with the Clerk of the Court Eastern District of Michigan using the ECF system, which will send notification of such filing to all users of record.

I further certify that I have caused the foregoing document to be emailed to the Bureau of Prisons, FCI Terre Haute, who will hand-deliver a copy to the defendant.

*s/Thomas Franzinger*
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9774
E-Mail: Thomas.franzinger2@usdoj.gov